IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE WASKINGTON,<br><br>       Plaintiff,<br> vs.<br><br>D. SANDOVAL, D. SANDQUIST, and K. TOWNSEND,<br><br>       Defendants. | No. C 10-0250 LHK (PR)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER SETTLEMENT PROGRAM |

Plaintiff, currently incarcerated at Corcoran State Prison and proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants Sandoval, Sandquist, and Townsend were deliberately indifferent to his safety, and retaliated against him during his incarceration at Salinas Valley State Prison ("SVSP"). Defendants have filed a motion for summary judgment. Plaintiff has filed an opposition, and Defendants have filed a reply. For the reasons discussed below, this Court grants in part and denies in part Defendants' motion for summary judgment.

## BACKGROUND[1]

Plaintiff is a California state prisoner with mobility impairment of the lower extremities (osteoarthritis and degenerative disc disease). (Compl. at 3:1.) Plaintiff's disability is the result

---

[1] The following facts are viewed in the light most favorable to the Plaintiff, and are undisputed unless otherwise indicated.

of a fall from an upper tier bunk during his incarceration at California State Prison, Los Angeles County on July 1, 2000. (*Id.*) At SVSP, Plaintiff was given an accommodation chrono, which indicated that he should have the following: ground floor cell, bottom bunk, orthopedic shoes and inserts, a wooden cane, cotton bedding, and a "mobility impaired" vest. (Opp., Ex. 1 at 33.)

I.  Plumbing problem and subsequent injury to Plaintiff

On June 10, 2008, Plaintiff was transferred from California State Prison, Los Angeles County to SVSP, a certified medical facility, under the Americans with Disabilities Act. (Compl. at 3:3.) At that time, Defendants Sandoval and Sandquist were employed as correctional officers at SVSP, and Defendant Townsend was a correctional plumber II employed at SVSP. (*Id.* at 2A.) Upon arrival, Plaintiff was assigned housing in Facility 'C' Building #2, Cell 122, Lower Bunk. (*Id.* at 3:4.) On that same day, June 10, 2008, Plaintiff observed that the in-cell toilet was leaking water and asked his cell mate, Inmate Robinson, about it. (*Id.* at 3A:5.) Inmate Robinson told Plaintiff that the toilet leak had been an ongoing problem for several weeks and that he had alerted staff on the second/watch shift, the unit floor officers, and Defendants Sandoval and Sandquist. (*Id.* at 3A:6.)

During the week following his arrival, Plaintiff almost fell several times when he got out of bed every morning walking from the bed to the sink because he had to walk through the standing water. (*Id.* at 3A:7.) Plaintiff personally addressed Defendants Sandoval and Sandquist about the issue and asked them to call the facility maintenance department to service the leaking toilet. (*Id.*) Specifically, on July 1, 2008, Plaintiff requested Defendants Sandoval and Sandquist place an order with Institution Plant Operations. (Pl.'s Decl. at 3:9.) Defendants told Plaintiff they had already placed several work orders to Institution Plant Operations requesting plumbing maintenance for both Cells 122 and 123 since the water damage had affected both units.[2] (Compl. at 3B:8.) As correctional officers, Defendants Sandoval and Sandquist were not involved in decisions by Plant Operations as to when and/or how to answer maintenance requests. (Decl. Sandoval at ¶ 5; Decl. Sandquist at ¶ 5.) The determination of when and/or how

---

[2] Defendants Sandoval and Sandquist do not recall ever speaking to Plaintiff about the leak. (Decl. Sandoval at ¶ 4; Decl. Sandquist at ¶ 4.)

to make repairs is made by Plant Operations, and not by correctional officers. (*Id.*)

On July 18, 2008, Plant Operations was contacted regarding the leak in Cell 122. (Compl. at 3J:45; Opp., Ex. 2 at 38; Pl.'s Decl. at 15:48.) On July 20, 2008, an institution plumber arrived to repair the leak.[3] (Compl. at 3E:19.) The plumber opened the connecting door between Cells 122 and 123, and discovered approximately twenty gallons of accumulated water that had leaked from the surrounding pipes. (*Id.* at 3E:21.) After vacuuming the water, the plumber indicated he would return within a few days to complete repairs to the leak. (*Id.*) On July 23, 2008, Defendant Townsend arrived at Plaintiff's cell to finish repairing the leak. (*Id.* at 3F:22.) Defendant Townsend flushed the 90-degree elbow pipe that was leaking into Cell 122 and 123 and replaced the slip washer, which appeared to remedy the problem at that time. (*Id.* at 3K:46.)

Following Defendant Townsend's July 23, 2008 visit, the leak recurred, prompting Plaintiff to file an Inmate Request for Interview and an accompanying letter with Warden Mike Evans to request an immediate intervention regarding the continued unsafe living conditions. (*Id.* at 3F:23.) Plaintiff's request and letter went unanswered, and there did not appear to be any direct follow up by the Warden in response. (*Id.* at 3F:24.) According to Defendant Townsend, the work he performed on July 23, 2008 appeared to be sufficient, and he believed the leak had been repaired. (Decl. Townsend at ¶ 4.) After the July 23, 2008 visit, Defendant Townsend was not advised that the leak in Plaintiff's cell had returned. (*Id.* at ¶ 5.)

On August 4, 2008, at approximately 6:15 a.m., Plaintiff got out of his bed and, using his walking cane, began walking toward the toilet and sink area of Cell 122. (*Id.* at 3F:25-3G:26.) Plaintiff slipped on the water and fell, hitting his jaw on the left side of his face. (*Id.* at 3G:26.) Plaintiff immediately contacted Defendants Sandoval and Sandquist, who were on duty at the time, to request medical attention for his injured jaw and strained lower back. (*Id.* at 3G:27.)

---

[3]The identity of the plumber(s) on July 20, 2008 is unknown. Plaintiff asserts there were two plumbers present: John Doe #1 and Defendant Townsend. Defendants counter that Townsend was not working on the date in question and therefore could not have been present for this exchange. (Decl. Townsend at ¶ 3.) However, Defendants do not dispute that a Salinas Valley plant operations staff member did visit Plaintiff's cell on July 20, 2008. (*Id.*)

Upon his return to SVSP from the city hospital on August 4, 2008, Plaintiff was told that the leak in Cell 122 had not been repaired following his injuries earlier in the morning. (Pl.'s Decl. at 13:41.) Plaintiff requested to be reassigned to a different cell because the leak was still present in Cell 122 and he was concerned about re-injury. (Compl. at 3I:39.) After his request was denied and he refused the yard sergeant's orders to return to Cell 122, Plaintiff was transferred to Facility D, the administrative segregation housing unit for disobeying the sergeant's orders. (*Id.* at 3J:41.)

Defendant Townsend returned to Cell 122 on August 26, 2008, where he discovered that the water manifold in the plumbing needed to be rebuilt. (*Id.* at 3K:47.) By August 28, 2008, the plumbing elbow had been repaired. (*Id.* at 3K:49.) On September 24, 2008, Defendant Townsend was dispatched back to Cells 122 and 123 to check on the leak and discovered that the metering box needed to be replaced. He performed those repairs the same day. (*Id.* at 3K:48.) Defendant Townsend then confirmed that parts had been replaced due to wear, and that the leaks had been repaired. (*Id.*)

II.     Mattress request, food tray incident, and disciplinary action

During the week following his June 10, 2008 arrival, Plaintiff requested that Defendants Sandoval and Sandquist replace his existing cell mattress with an appropriate exchange mattress. (*Id.* at 3B:9.) Plaintiff had been sleeping on a torn up mattress that aggravated his pre-existing mobility impairment of the lower extremities. (*Id.* at 3B:9.) The mattress did not provide adequate comfort on his steel metal bunk. (Pl.'s Decl. at 4:11.)

On June 16, 2008, having not yet received a replacement mattress, Plaintiff submitted a CDCR-1824 Reasonable Modification or Accommodation Request Appeal (Log # SVSP-C-08-2840). (Compl. at 3B:10; Opp. Ex. 1 at 26.) The request was received by the facility's Appeals Coordinator's Office on June 17, 2008. (Decl. Medina, Ex. A.) SVSP Medical Appeals processed, reviewed, and granted Plaintiff's request on July 7, 2008. (*Id.*)

Meanwhile, on June 18, 2008, having not yet received a new mattress, Plaintiff complained to Unit Classification Committee (U.C.C.) Chairperson, Captain V. Solis, and cited Defendants Sandoval and Sandquist as having not timely fulfilled Plaintiff's original request.

1  (Compl. at 3C:11.) Captain Solis then instructed Defendant Sandquist to immediately provide
2  Plaintiff with the appropriate exchange mattress. The new mattress was in place after the
3  conclusion of the U.C.C. hearing on June 18, 2008. (*Id.* at 3C:12.)

4      Following the mattress incident, Plaintiff continued to be subject to harassment and
5  retaliatory acts by Defendant Sandoval. (*Id.* at 3C:13.) At issue was Plaintiff's approved request
6  for a vegetarian religious meal plan. (*Id.* at 3C:13.) Plaintiff had received institutional approval
7  for a religious vegetarian diet through the Food Manager's Office and a Muslim Imam on June
8  24, 2008. (Pl.'s Opp'n. Defs.' Mot. Summ. J. Ex. 3 at 5.) Defendant Sandoval told Plaintiff he
9  would not receive the religious meals because Plaintiff had complained about the mattress to
10 Captain Solis. (Compl. at 3C:13.)

11     On July 1, 2008, at approximately 7:50 a.m., Defendant Sandoval was going cell-to-cell
12 collecting food trays from the breakfast meal period. (Decl. Sandoval at ¶ 6.) Defendant
13 Sandoval came to Plaintiff's cell and gave him a direct order to return his food tray, to which
14 Plaintiff refused. (*Id.*) Plaintiff requested the presence of Defendants Sandoval and Sandquist's
15 supervising officer to rectify the continued non-vegetarian meals they had been delivering to
16 Plaintiff. (Pl.'s Decl. at 6:17.) Defendant Sandoval then advised Plaintiff that he would be
17 issued a Rules Violation Report for disobeying a direct order. Defendant Sandoval issued Rules
18 Violation Report, Log # C-08-07-0003, charging Plaintiff with "Disobeying a Direct Order," an
19 administrative offense. (*Id.* at 3:26-4:2; Decl. Medina, Ex. B.) On July 17, 2008, Plaintiff was
20 found guilty of disobeying a direct order to relinquish a food tray and assessed 10 days of lost
21 privileges, including no quarterly packages and no special purchases from the canteen. (Decl.
22 Sandoval, Ex. A.)

23     On August 3, 2008, Plaintiff submitted an administrative grievance, appeal log number
24 SVSP-C-08-3594, in response to being found guilty of the charge. (Decl. Medina ¶¶ 5-6; Decl.
25 Shin ¶ 2.) Plaintiff requested that the finding be reversed and that he be provided equal rights as
26 all other religious inmates receiving vegetarian diets in California State Prisons. (Decl. Medina
27 ¶ 5.) Plaintiff alleged that Defendant Sandoval violated his First Amendment right to petition a
28 government agency free from retaliatory actions. (Compl. at 3D-E:18.) Plaintiff alleged in his

appeal that Defendant Sandoval's Log # C-08-07-0003 regarding the food tray was generated as retaliation for Plaintiff's Log # SVSP-C-08-2840 regarding the replacement mattress. (*Id.*) Plaintiff's appeal was subsequently denied. (*Id.* at 4:14.)

**DISCUSSION**

I.    Standard of Review

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

II.    Analysis of Legal Claims

    A.    Eighth Amendment deliberate indifference to safety claim

A prisoner may state a §1983 claim under the Eighth Amendment against prison officials only where the officials acted with "deliberate indifference" to the threat of serious harm or injury to an inmate by physical conditions at the prison. *See Frost v. Agnos*, 152 F.3d 1124,

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Pro Se Prisoner Settlement Program
G:\PRO-SE\SJ.LHK\CR.10\Washington250msjqi.wpd     6

1128-29 (9th Cir. 1998). The failure of prison officials to protect inmates from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is objectively, sufficiently serious; and (2) the prison official is subjectively, deliberately indifferent to inmate safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hearns v. Terhune*, 413 F.3d 1036, 1040-41 (9th Cir. 2005). A prisoner need not wait until he is actually injured to state a claim and obtain relief. *See Farmer*, 511 U.S. at 845. If the Court finds the Eighth Amendment's objective and subjective requirements are met, it may grant appropriate relief. *See id.* at 845-46.

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. *See, e.g.*, *Hearns*, 413 F.3d at 1041-42 (allegations of serious health hazards in disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions). "The more basic the need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

In regard to the subjective component of the analysis, a prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* However, a claimant need not show that a prison official acted or failed to act believing that harm actually would befall the inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *See id.* at 842; *see also Robins v. Meecham*, 60 F.3d 1436, 1439-40 (9th Cir. 1995). This is a question of fact. *Farmer*, 511 U.S. at 842.

In the instant case, Plaintiff is entitled to relief under the Eighth Amendment if he can

1 show: (1) the toilet leak was objectively, sufficiently serious; and (2) Defendants Sandoval, Sandquist, and Townsend were subjectively, deliberately indifferent to Plaintiff's safety. *See Farmer*, 511 U.S. at 834; *Hearns*, 413 F.3d at 1040-41. In analyzing this claim, the Court will address it in two separate parts: (1) the facts prior to the July 23, 2008, fix, and (2) the facts after the July 23, 2008 fix.

### 1. Prior to July 23, 2008

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff states that Defendants Sandoval and Sandquist told Plaintiff that they notified Plant Operations several times about the leak. Defendants Sandoval and Sandquist each aver that they do not recall having any conversation with Plaintiff about a leak in his cell, but allege that if they had learned about a leak, they would have immediately reported it to Plant Operations. (Decl. Sandoval at ¶ 4; Decl. Sandquist at ¶ 4.) Plant Operations has no record of anyone contacting it about this leak until July 18, 2008. In addition, the prison log book recorded no standing water in Plaintiff's cell at the time Plaintiff arrived at SVSP. (Opp., Ex. 2 at 38.) A reasonable inference can be drawn that Defendants Sandoval and Sandquist failed to call Plant Operations for at least seventeen days after being notified of the leak. Thus, there is a genuine issue of material fact regarding: (1) whether there was any leak at the time Plaintiff arrived at SVSP, (2) whether Defendants Sandoval and Sandquist actually called Plant Operations at least by July 1, 2008, when Plaintiff complained of the standing water, and (3) whether a seventeen-day delay in contacting Plant Operations constituted deliberate indifference.

However, Defendants also argue that they are entitled to qualified immunity. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and (2) whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Pro Se Prisoner Settlement Program
G:\PRO-SE\SJ.LHK\CR.10\Washington250msjqi.wpd         8

1  The Court may exercise its discretion in deciding which prong to address first, in light of the
2  particular circumstances of each case. *Id.*

3  The qualified immunity inquiry is separate from the constitutional inquiry for a claim of
4  deliberate indifference under the Eight Amendment. *Estate of Ford v. Caden*, 301 F.3d 1043,
5  1053 (9th Cir. 2002). For a qualified immunity analysis, the Court need not determine whether
6  the facts alleged show that defendants acted with deliberate indifference. *See Osolinski v. Kane*,
7  92 F.3d 934, 936 (9th Cir. 1996). Rather, the focus of review is the objective requirement. *Id.* at
8  937. The Court need only review the relevant law to determine whether, in light of clearly
9  established principles at the time of the incident, the officials could have reasonably believed
10 their conduct was lawful. *See id.* at 939. Thus, the Court must determine whether it was clearly
11 established that a prison official who knew about a toilet leak for almost three weeks before it
12 was serviced created a sufficiently serious deprivation of a human need in violation of the Eighth
13 Amendment. *See id.* at 937.

14 A court determining whether a right was clearly established looks to "Supreme Court and
15 Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v. Bieter*, 623
16 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski*, 92 F.3d at 936). In the absence of binding
17 precedent, the Court may look to all available decisional law, including the law of other circuits
18 and district courts. *See id.* Unpublished district court decisions may also "inform" the Court's
19 analysis. *Bahrampour v. Lampert*, 356 F.3d 969, 77 (9th Cir. 2004).

20 Persons involuntarily confined by the state have a constitutional right to safe conditions
21 of confinement. *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985). However, "[n]ot
22 every deviation from ideally safe conditions amounts to a constitutional violation." *Id.* For
23 example, a prisoner's bare complaint about a slippery floor, without more, does not state an
24 arguable claim for cruel and unusual punishment. *Jackson v. Arizona*, 885 F.2d 639, 641 (9th
25 Cir. 1989).

26 In *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993), the prisoner argued that
27 wearing handcuff and shackle restraints while in the shower violated the Eighth Amendment.
28 The Ninth Circuit concluded that "[e]ven if the floors of the shower are slippery and [the

prisoner] might fall while showering, slippery prison floors . . . do not state even an arguable claim for cruel and unusual punishment." *Id.* (citing *Jackson*, 885 F.2d at 641) (internal quotation marks omitted).

In *Osolinski*, a prisoner brought a § 1983 action claiming that the failure of prison officials to repair an oven, the door of which fell off and burned his arm, violated the Eighth Amendment. *Id.* at 935. The record showed that maintenance requests for fixing the oven door had been submitted for over seven months, but no repairs occurred. *Id.* In its qualified immunity analysis, the Ninth Circuit did not reach the issue of whether the facts alleged showed that the prison officials acted with deliberate indifference. *Id.* at 937. Instead, the court determined whether, in light of clearly established principles at the time of the incident, the officials could have believed their conduct was lawful. *Id.* The Ninth Circuit found that it was not "clearly established that a single defective device, without any other conditions contributing to the threat to an inmates' safety, created an objectively insufficiently inhumane condition to be violative of the Eighth Amendment." *Id.* at 938. The court stated that the prisoner failed to plead any exacerbating conditions and specifically, "has not pled any conditions which rendered him unable to provide for his own safety in the sense that they precluded him from avoiding the faulty oven door or rendered him unable to perceive its defective condition." *Id.*

Two years later, in *Frost v. Agnos*, 152 F.3d 1124, 1128-29 (9th Cir. 1998), the Ninth Circuit found that a slippery prison floor could give rise to a constitutional claim where prison officials did not provide an inmate on crutches with an accessible shower, despite their knowledge that the inmate's use of crutches had already caused him to fall and injure himself on several occasions on the slippery bathroom floor. *See id.* at 1129-30. In *Frost*, the Ninth Circuit observed that the prisoner's repeated injuries, in addition to his required use of crutches, raised a triable issue of fact with regard to whether the prison officials' failure to provide him with adequate shower facilities violated his Eighth Amendment right. *Id.* at 1129-30. The Ninth Circuit distinguished *LeMaire* and *Jackson* because the inmate in *Frost* had repeatedly injured himself, and was faced with unsafe conditions due to his use of crutches. *Id.* at 1129.

Here, viewing the evidence in the light most favorable to the Plaintiff, as this Court must

do, the toilet leak was inside Plaintiff's living quarters and continued for at least seventeen days after he notified Defendants Sandoval and Sandquist, and before a plumber came to service the leak. The evidence is undisputed that the leaking water covered "the entire cell floor area around the toilet and connecting sink." (Compl. at 3A:5.) Plaintiff is a mobility impaired prisoner, like the inmate in *Frost*. However, unlike the inmate in *Frost* who required crutches to get around, there is no evidence that Plaintiff cannot ambulate without his cane. Nor is there evidence that Defendants Sandoval or Sandquist knew that Plaintiff used a cane, or that Plaintiff could not ambulate at all without his cane. Further, unlike the inmate in *Frost* whose requests for a reasonable accommodation went unanswered even after he had repeatedly fallen and injured himself, here, there is no evidence that Plaintiff had fallen or injured himself prior to the plumbers' initial attempt to fix the toilet leak. *See, e.g.*, *Frost*, 152 F.3d at 1129. Finally, unlike the inmate in *Frost*, Plaintiff does not allege that he had difficulty walking to the toilet or sink through the standing water. *See, e.g.*, *id.* at 1127 ("he alleges that he had difficulty showering because he was unable to maneuver his crutches on the slippery bathroom floor and over the wall surrounding the shower").

Plaintiff's case appears to fall somewhere in between *Frost* and *Jackson*. Clearly, there is some risk of danger when there is standing water that could potentially create a slippery surface. However, the law is not sufficiently clear at what point a risk of danger turns into a sufficiently substantial risk for Eighth Amendment purposes. *See Farmer*, 511 U.S. at 834 n.3; *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051 (9th Cir. 2002) (recognizing that although *Farmer* clearly stated that prison officials could not deliberately disregard a substantial risk of serious harm, it left open the issue of when the risk of harm "changes from being a risk of some harm to a substantial risk of serious harm"). Here, the risk of harm turns into a substantial risk of serious harm somewhere between a bare claim of a slippery floor and a claim of a hazard plus some known exacerbating condition.

Because the law is not clearly established as to when a slippery floor becomes sufficiently substantial for Eighth Amendment purposes, it would not be clear to a reasonable prison official when the risk of harm from not fixing a toilet leak changes from being a risk of

*some* harm to a *substantial* risk of *serious* harm. *See, e.g.*, *Estate of Ford*, 301 F.3d at 1050-51. *Compare Johnson v. Martinez*, No. 02-17101, 2003 WL 21437585 (9th Cir. June 17, 2003) (vacating grant of qualified immunity when prisoner, who walked with cane, requested reasonable accommodation in shower after he had already slipped and fallen twice, and prison officials did nothing before prisoner fell and injured himself a third time) (unpublished memorandum disposition); *Frost*, 152 F.3d at 1129 (finding that slippery floor plus exacerbating factors that prisoner repeatedly injured himself, and was forced to use crutches, was sufficient to establish serious condition); *Hoptowit*, 753 F.2d at 784 (concluding that existing hazards plus exacerbating hazard of bad lighting was sufficient to establish serious threat to the safety of inmates); *Anderson v. Towne*, No. 08-2480, 2010 WL 455387 (E.D. Cal. Jan. 29, 2010) (wheelchair-bound prisoner who discovered sharp, broken tiles at entrance to the shower, complained and continually made requests to have it repaired for over a year, had medical reports stating that his hands were weak and he could not move around to sit or stand without his wheelchair, survived motion for summary judgment) *with McLaughlin v. Farries*, No. 03-60771, 2004 WL 2030365 (5th Cir. Sept. 13, 2004) (per curiam) (unpublished opinion) (concluding that prisoner's slip and fall on accumulated water from leaky air conditioning unit, which the defendants knew about and failed to clean up was an appropriate action for negligence, but not deliberate indifference); *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) (concluding that although prisoner complained for two months about accumulated water in the shower, and finally sustained injuries from the slippery floor, "while the standing-water problem was a potentially hazardous condition, slippery floors constitute a daily risk faced by members of the public at large" and is not a sufficiently serious risk of constitutional dimension); *Brown v. Basher*, No. 10-0479 MCE EFB, 2012 WL 639446 (E.D. Cal. Feb. 27, 2012) (granting defendants' motion for summary judgment against a mobility impaired prisoner who ambulated with a cane and slipped and fell on puddle, created by a water leak, concluding that even though defendants knew about the puddle, the claim was one of negligence rather than deliberate indifference); *Gilman v. Woodford*, No. 05-0337, 2006 WL 1049739 (E.D. Cal. April 20, 2006) (granting qualified immunity to defendants when prisoner slipped and fell in puddle of water

resulting from leaking ceiling, of which defendants knew); *Edwards v. City of New York*, No. 08-5787, 2009 WL 2596595 (S.D.N.Y. Aug. 24, 2009) (courts have held that allegations of wet conditions leading to a slip-and-fall will not support a Section 1983 claim even where . . . the plaintiff [ ] alleges that the individual defendants had notice of the wet condition but failed to address it."); *Vines v. Hepp*, No. 07-956, 2007 WL 3342583 (E.D. Wis. Nov. 8, 2007) (finding accumulated puddles of water in shower not objectively serious condition sufficient to implicate Eighth Amendment); *Jennings v. Horn*, No. 05-9435, 2007 WL 2265574 (S.D.N.Y. Aug. 7, 2007) (finding five months of water accumulation in detainee's cell did not objectively violate contemporary standards of decency and noting that "slippery prison floors, at best, pose a claim of negligence, which is not actionable under the United States Constitution."); *Santiago v. Guarini*, No. 03-4375, 2004 WL 2137822 (E.D. Pa. 2004) (holding toilet and sink leak in cell, causing slip and fall, did not present substantial risk to inmate's safety, and was not objectively serious conditions); *Tunstall v. Rowe*, 478 F.Supp. 87, 89 (N.D. Ill. 1979) (finding greasy staircase that caused prisoner to slip and fall not sufficient to violate the Eighth Amendment, *Snyder v. Blankenship*, 473 F.Supp. 1208, 1212 (W.D. Va. 1979) (failure to repair leaking dishwasher which resulted in a pool of soapy water in which prisoner slipped did not violate Eighth Amendment).

Because the law was not clearly established that a reasonable prison official could have believed that the failure to respond to a toilet leak for almost three weeks was a sufficiently serious deprivation, this Court finds that Defendants are entitled to qualified immunity as to this portion of the deliberate indifference claim.

        2. <u>After July 23, 2008</u>

Plaintiff also attributes his subsequent injury on August 4, 2008, to Defendants. He alleges that Defendants Sandoval and Sandquist "fail[ed] to timely place work order to Institution Plant Operations to maintenance [sic]" toilet leak. However, Plaintiff fails to provide evidence that Defendants Sandoval or Sandquist proximately caused the deprivation of a federally protected right. *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). A person deprives another of a constitutional right within the meaning of section 1983 if he does an

affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to do, that causes the deprivation of which the plaintiff complains. *See id.* at 633. The Ninth Circuit explained that to recover damages against a prison official in an Eighth Amendment claim, the plaintiff must prove "(1) that the specific prison official, in acting or failing to act, was deliberately indifferent to the mandates of the eighth amendment and (2) that this indifference was the actual and proximate cause of the deprivation of the [plaintiff's] eighth amendment right[s]. . . ." *Id.* at 634 (citations omitted). The causation inquiry focuses on "whether the individual defendant was in a position to take steps to avert" the harm to the plaintiff, as well as what "the duties, discretion, and means of each defendant" were at the time. *Id.* at 633-34.

Here, there is an absence of evidence that Defendants Sandoval or Sandquist knew that Plaintiff was still experiencing a leak in his cell after July 23, 2008, or that they disregarded any risk from that recurring leak. Plaintiff states that after the plumbers fixed the leak on July 23, 2008, the leak sprung again. Plaintiff filed a request for interview and letter to Warden Evans regarding the leak, but never received a response. (Compl. at 3F:23-24.) Plaintiff also asserts that in September 2008, he informed Defendant Townsend that he had "encountered hostility" from Defendants Sandoval and Sandquist when he "reminded them" of the toilet leak prior to the August 4, 2008 injury. (Decl. Pl. at ¶ 52.) However, nowhere does Plaintiff assert that Defendants Sandoval or Sandquist knew that the leak had returned after the initial fix, nor can a reasonable inference be drawn that Defendants Sandoval or Sandquist consciously disregarded any excessive risk to Plaintiff's harm after July 23, 2008. In addition, Plaintiff does not assert that, after July 23, 2008, he asked Defendants Sandoval or Sandquist to call Plant Operations to service the toilet again, or that they were aware that the toilet began to leak again. In short, there is an absence of evidence that Defendants Sandoval and Sandquist knew about any potential harm to Plaintiff, much less an *excessive* risk of harm, or were in a position to "take steps to avert" the harm to Plaintiff that occurred on August 4, 2008.

Similarly, with respect to Defendant Townsend, there is an absence of evidence that he knew Plaintiff faced a substantial risk of harm and consciously disregarded it. *See Farmer*, 511

U.S. at 837. According to Plaintiff, Defendant Townsend arrived two days after the request for maintenance was submitted. After vacuuming the excess water, Defendant Townsend stated he would return in a few days to complete the repair. Three days later, Defendant Townsend did so, and believed that the leak had been repaired. Following the July 23 repair work, the leak returned. Plaintiff wrote a letter to the Warden requesting intervention regarding the continued unsafe living conditions. However, there is no evidence that the contents of this letter were shared with any of the Defendants, or that they had knowledge that the leak had returned. Thus, there is no genuine issue of disputed fact that Defendant Townsend did not know Plaintiff faced a substantial risk of harm and consciously disregarded it before Plaintiff's injury on August 4, 2008.

Accordingly, this portion of Defendants' motion for summary judgment on the claim of deliberate indifference is granted as to all Defendants.[4]

B. First Amendment retaliation claim

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Prisoners may not be retaliated against for exercising their right of access to the courts. *See Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). This constitutional prohibition clearly includes retaliation for filing a complaint. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). The right of access to the courts extends to established prison grievance procedures. *See Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995).

Defendants claim that Plaintiff has failed to provide proof of an adverse action based on retaliatory motives that did not serve legitimate correctional goals. Defendants assert that

---

[4] Because this portion of the motion for summary judgment is granted, the Court will not address Defendants' alternative request for qualified immunity.

retaliation claims can only survive if the alleged retaliatory motives were the "but-for" cause of the challenged conduct. *Hartman v. Moore*, 547 U.S. 250, 259 (2006). However, a prisoner may show retaliatory motive by the timing of the allegedly-retaliatory act and inconsistency with previous actions as well as direct evidence. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). Given the two week proximity between the mattress complaint and the challenged disciplinary action, and Defendant Sandoval's statement to Plaintiff that he would not receive his religious meals because Plaintiff had complained about the mattress, there exists a genuine issue of material fact as to whether the discipline was motivated by retaliation.

Defendants also claim that Plaintiff has failed to show that his First Amendment rights were "chilled." However, the prisoner need not demonstrate a <u>total</u> chilling of his First Amendment rights in order to establish a retaliation claim. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). That a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough. *Id.* at 569 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit).

Plaintiff does not dispute that prisons have a legitimate penological interest in maintaining safety. However, in the prison context, "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Bruce*, 351 F.3d at 1289. Viewing the evidence in the light most favorable to Plaintiff, because Defendants Sandoval and Sandquist used the disciplinary procedure as a cover to silence Plaintiff because he filed grievances, their assertion that the discipline served a valid penological purpose is insufficient to defeat a retaliation claim on summary judgment. *See id.*

Thus, Defendants' motion for summary judgment on the retaliation claim is denied.

For purposes of qualified immunity analysis, it is clearly established, such that it would be clear to a reasonable officer, that it is unlawful for the government to deliberately retaliate

against a citizen for exercising his right to access the courts and administrative appeals process for redress of grievances. *CarePartners v. Lashway*, 545 F.3d 867, 882 (9th Cir. 2008). Viewing the evidence in the light most favorable to the Plaintiff, a reasonable officer faced with the same circumstances as Defendants Sandoval and Sandquist could not have believed that issuing a disciplinary violation in retaliation for Plaintiff's prior complaints about the mattress was lawful. As such, Defendants Sandoval and Sandquist are not entitled to qualified immunity for Plaintiff's claim of retaliation.

III. <u>Referral to Pro Se Prisoner Settlement Program</u>

The Court finds good cause to refer this matter to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings on the claim set forth above. The proceedings will consist of one or more conferences as determined by Judge Vadas. The conferences shall be conducted with Defendants Sandoval and Sandquist, or their representatives, attending by videoconference if they so choose. If these settlement proceedings do not resolve this matter, the Court may set this matter for trial or order other further proceedings, and consider a motion from Plaintiff for appointment of counsel.

**CONCLUSION**

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is denied with respect to Plaintiff's Eighth Amendment claim of deliberate indifference to safety, but Defendants' request for qualified immunity is granted. Summary judgment and qualified immunity are denied with respect to Plaintiff's First Amendment claim of retaliation.

2. The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings on the remaining claims in this action, as described above. The proceedings shall take place within **one-hundred twenty (120) days** of the filing date of this order or is as soon is practicable. Judge Vadas shall coordinate a time and date for a settlement conference with all interested parties or their representatives and, within **ten (10) days** after the conclusion of the settlement proceedings, file with the Court a report regarding the prisoner settlement proceedings.

3. The Clerk of the Court shall mail a copy of the Court file, including a copy of this order, to Judge Vadas in Eureka, California.

4. The instant case is STAYED pending the settlement conference proceedings.

IT IS SO ORDERED.

Dated: 3/22/12

_____
LUCY H. KOH
United States District Judge